[Cite as *In re L.M.*, 2025-Ohio-4653.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

IN RE: L.M.,

DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 BE 0025

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Belmont County, Ohio
Case No. 24 JC 118

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Richard D. Hixson*, for Appellant and

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor, and *Atty. Jacob A. Manning*, Assistant Prosecuting Attorney, for Appellee.

Dated: October 7, 2025

**DICKEY, J.**

{¶1} Appellant, K.M. ("Mother") appeals the May 9, 2025 judgment entry of the Belmont County Court of Common Pleas, Juvenile Division, sustaining the motion for permanent custody of L.M. (d.o.b 3/1/2024) filed by the Belmont County Department of Job and Family Services ("Agency"). Mother advances three assignments of error.

{¶2} First, Mother argues the manifest weight of the evidence does not support the juvenile court's decision finding she will be unable to provide an adequate permanent home for L.M., as anticipated, within one year after the merits hearing. Second, Mother asserts permanent Agency custody is not in L.M.'s best interest. Finally, Mother contends her trial counsel provided ineffective assistance because he did not seek a second continuance of the merits hearing in order for Mother and her sister, E.M. ("Sister"), to undergo second psychological examinations. Finding no error, the judgment entry of the juvenile court sustaining the Agency's motion for permanent custody is affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶3} The Agency's involvement in this matter commenced on the day of L.M.'s birth, after Mother and Sister arrived at Southeastern Medical Center in Cambridge, Ohio for Mother to undergo a Cesarian section. Mother and Sister were filthy and both women were required to shower before physicians would deliver L.M.

{¶4} At the time, Mother and Sister lived in a shed with P.M., L.M.'s maternal grandmother ("Grandmother"), and two other women, identified in the record as "Mrs. Gray and Mrs. Gray's 14-year-old daughter." The shed was located on property owned by D.M., L.M.'s maternal great-grandmother ("Great-Grandmother").

{¶5} The shed had no utilities, but for electricity from a single extension cord connected to a neighboring shed. Nonetheless, Sister represented she and Mother had bathed before traveling to the hospital.

{¶6} During the investigation that followed, the Agency learned Mother and Grandmother were indicted in October of 2023 for 24 counts of felony and misdemeanor animal cruelty, when twelve companion animals and three chickens, apparently suffering from neglect, were found dead in the shed. They were also charged with one count of

misdemeanor child endangerment. Mother learned she was pregnant while being held in the Belmont County Jail from September 16, 2023 to November 15, 2023.

{¶7} Grandmother had a history of convictions for animal abuse dating back to Mother's childhood. As a result, Grandmother was a pariah in the community and the family was the subject of public distain and threats of bodily harm.  During that time, Mother developed anxiety, panic attacks, and stress-induced seizures.  Mother denied any panic attacks or seizures in her adult life, but reported she still suffers from significant anxiety.

{¶8} Mother identified L.M.'s father as A.D., a Canadian resident whom she met online, however, paternity was never legally established. The Agency attempted to place L.M. with T.B. ("Aunt T") or L.S. ("Aunt L"), Mother's maternal aunts, but Aunt T failed the home study and Aunt L was unable to maintain placement due to childcare problems. Mother was unable to live with Aunt L because she had dogs, which constituted a violation of a condition of Mother's bond.

{¶9} As a consequence, the Agency filed a complaint alleging L.M. was a dependent child on March 4, 2024.  On March 7, 2024, the juvenile court conducted an emergency shelter hearing. After receiving testimony, the juvenile court placed L.M. in the temporary emergency custody of the Agency.  A Guardian Ad Litem ("GAL") was appointed that same day.

{¶10} The case plan was filed on March 20, 2024.  Case plan requirements for Mother included resolving the criminal matter and following any order of the trial court, undergoing a psychological assessment and following the recommendations therein, completing parenting classes, acquiring safe housing, securing a job, and following the recommendations of all care providers.  Case plan goals for Mother included:

- demonstrating her understanding of [L.M.'s] capabilities re: age, intellectual development, and respond to needs.

- understanding that [L.M.] had different needs at different ages.

- providing structure and consequences as needed.

- seeking assistance and utilizing resources to meet the child and household needs.

{¶11} According to the second report of the GAL, filed on April 30, 2024, L.M.'s foster home was clean and spacious, but L.M. was suffering from digestive problems. Foster parents reported Mother had refused to allow them to have L.M. vaccinated for childhood diseases or administer gas drops to treat L.M.'s reflux. Mother, who conceded she was living with Aunt L, which constituted a bond violation, objected to vaccines due to a negative reaction she suffered as a child. Mother expressed the desire to perform additional research before authorizing any vaccinations or medications. According to the GAL, Mother was ultimately cooperative, but defensive and argumentative during exchanges.

{¶12} The adjudicatory hearing was continued pending the outcome of a motion pending in the criminal case to determine Mother's competency to stand trial. At a hearing on April 29, 2024 in the criminal case, following the issuance of the competency report, both parties stipulated to the findings in the report and Mother was found competent to stand trial.

{¶13} L.M. was adjudicated a dependent child at a hearing in the juvenile court held on May 8, 2024. A child is considered to have entered the custody of a children service agency on the earlier of two dates – the date that the child is adjudicated pursuant to R.C. 2151.28 or the date that is sixty days after the removal of the child from home. R.C. 2151.414(B)(1). Consequently, L.M. entered the custody of the Agency for statutory purposes on May 7, 2024.

{¶14} On June 18, 2024, Mother pleaded guilty to six second-degree misdemeanor counts of cruelty against companion animals in violation of R.C. 959.131. On July 2, 2024, Mother was sentenced to 60 days in jail on each count (360 days total), suspended, and placed on three years of probation. Relevant to this appeal, Mother was prohibited from possessing any animals as a term of her probation.

{¶15} In the third report of the GAL, filed on August 15, 2024, the GAL observed Mother was given feedback regarding her supervised visitation with L.M. at a family team meeting on June 18, 2024, and Mother appeared agitated that her parenting was being questioned. Mother rejected the foster family's recommendations regarding feeding L.M.,

as it related to her reflux, because "how could the foster family know better than [L.M.'s] own mother?" Moreover, both Mother and Sister challenged the Agency's impartiality and argued L.M.'s emergency removal from Mother's custody was unwarranted.

{¶16} After observing supervised visitation at the Agency, the GAL opined Mother interacted with L.M. the way a pre-school-aged child would interact with a baby doll. Further, Mother improperly fastened L.M. in her car seat in a way that jeopardized L.M.'s life in the event of a collision. Finally, Mother refused to provide contact information for A.D., despite her ongoing long-distance relationship with him.

{¶17} Following a home visit, the GAL was concerned that Sister had many dolls, to which she referred by proper name. Sister assigned personalities to each of the dolls, and reasoned L.M. could wear the baby dolls' clothes when the baby dolls outgrew them.

{¶18} At review hearings conducted on August 21, 2024 and November 20, 2024, the juvenile court continued the Agency's temporary custody of L.M. In the interim, Mother attended counseling and parenting classes, obtained a job at a gas station, then later at McDonald's, and secured an apartment with Sister on May 1, 2024 through the Housing and Urban Development financial assistance program. Mother was ordered by the juvenile court to provide contact information for A.D. to the Agency.

{¶19} In the fourth report of the GAL, filed on November 12, 2024, the GAL identified "very serious concerns" regarding Mother's ability to feed L.M. Mother was not properly mixing L.M.'s cereal, which created a potential choking hazard. The GAL further observed Mother and Sister continued to be argumentative with Agency staff whenever feedback was offered regarding parenting skills. According to the GAL, Mother and Sister misinterpreted feedback as a "personal attack," and Mother continued to assert she alone knew what was best for L.M. because she is her biological mother.

{¶20} At the quarterly case review on November 15, 2024, the juvenile court acknowledged Mother and Sister were fulfilling the requirements of the case plan. However, with respect to the case plan goal of reunification, Mother and Sister continued to be argumentative and misinterpret feedback and instruction as personal insults. The juvenile court observed Mother had "at no point taken responsibility for her role that caused the case to be opened." Instead, Mother blamed various parties for conspiring to

take L.M. from her.   The juvenile court wrote, "[t]he next steps are relying heavily on the results of the psychological assessments."

**{¶21}**  Mother identified Sister as a caretaker for L.M.  As a consequence, Mother (on July 23, 2024 and September 10, 2024) and Sister (on November 13, 2024, January 2 and 9, 2025) underwent psychological assessments and cognitive testing with Aimee Thomas, Ph.D. at Lighthouse Family Center Ltd.   Dr. Thomas provided her written findings to the Agency on December 26, 2024 (Mother) and January 25, 2025 (Sister).

**{¶22}**  At the time of the evaluation, Mother was 31 years of age with an IQ of 77. Mother's presentation was childlike.  During the evaluation, Mother talked incessantly about random topics, she was easily distracted by objects in the room and demonstrated impulse control issues.  Dr. Thomas identified potential diagnoses of Major Depressive Disorder, recurrent, Generalized Anxiety Disorder, Attention Deficit Hyperactivity Disorder ("ADHD") and Bipolar disorder.

**{¶23}**  While Dr. Thomas did not conclude Mother's IQ alone disqualified her as a permanent caretaker for L.M., Dr. Thomas opined Mother would encounter difficulties understanding and learning parenting instructions, and "require a highly structured approach to parenting skill training, with checking and rechecking to ensure comprehension and transfer of learning."   Dr. Thomas continued, "[i]ndividuals with MCMI-IV profiles . . . can be emotionally excitable and prone to trauma and exaggeration. At times, such individuals may present with anger management difficulties and a low threshold for frustration." Finally, Dr. Thomas observed, "[t]hey are inclined to deny responsibility for their shortcomings or examine the role they play in difficult situations." (Mother psychological report, p. 8.)

**{¶24}**  Dr. Thomas was particularly concerned with Mother's failure to recognize any mistakes on her part, or the part of Grandmother, in caring for themselves and the animals in the shed.  Mother characterized the animals as her "fur babies" and insisted they should have been returned to her custody.   Dr. Thomas "recommended that counseling specifically assist [Mother] with understanding how her childhood experiences were not adaptive or conducive to raising an infant."   Dr. Thomas opined, "unless and until [Mother] demonstrates such insight and acknowledged personal responsibility for her neglect of her animals, [Mother] is not likely to change."  (*Id.* at p 13.)

{¶25} Dr. Thomas observed the symptoms of anxiety and ADHD compound one another, and suggested Mother could benefit from prescription medication. Dr. Thomas reasoned medication may allow Mother to "increase her capacity to learn new data and reduce her impulse control problems" and "improve her capacity to attend to [L.M.'s] needs without distraction or emotional reactivity." (*Id*. at p. 12.)

{¶26} The Agency reported to Dr. Thomas that Mother had not benefited from her participation in basic parenting skills training. As a consequence, Dr. Thomas recommended intensive parenting training, opining "it is critical that facilitators evaluate and assess [Mother's] actual ability to learn, internalize and apply information taught in the programs into her real-life interactions with [L.M.]" (*Id.* at p. 13.)

{¶27} Finally, Dr. Thomas opined a healthy and adaptive support system in the community was essential to assist Mother due to her liabilities, and L.M. should be enrolled in a protective day care should Mother assume custody given Mother's "marginal abilities." (*Id.*) Significantly, Dr. Thomas recommended a relative placement, which would enable Mother to "remain actively involved in [L.M.'s] life while not being responsible for meeting [L.M.'s] day-to-day basic needs." (*Id.*)

{¶28} Sister, who was 21 years of age and had an IQ of 71, is a Supplemental Security Income recipient due to her borderline intellectual functioning and epilepsy. Sister had never been employed. She presented as childlike and giggled throughout the second part of the evaluation. Sister informed Dr. Thomas that Sister and Mother considered themselves "co-mommies."

{¶29} Dr. Thomas opined "[i]ndividuals within a similar intellectual ability of [Sister] would benefit from participating in a highly structured approach to parenting skill training, with checking and rechecking to ensure comprehension and transfer of learning." Dr. Thomas continued, "[e]ven with the support of intensive services, such individuals will require ongoing support and assistance raising children given ongoing concerns with judgment, reasoning, and the ability to perceive potentially problematic situations." (Sister psychological report, p. 8.) Of equal concern, Dr. Thomas noted Sister displayed an unwarranted confidence in her decision-making ability.

{¶30} Like Mother, Sister did not assign any responsibility for the starvation and death of the animals in the shed to Mother or Grandmother. Sister stated the family was

forced to abandon the shed after a water pump on the property broke, and the animals died after the family left.  Significantly, Dr. Thomas opined Sister "presents with liabilities that preclude her from compensating for [Mother's] liabilities . . ." (*Id.* at p. 11.)

**{¶31}** It is important to note Dr. Thomas recommended intensive parenting classes for both Mother and Sister, but also recognized the significant difficulty they would have, not only retaining the information but also recognizing situations in which the information would apply.  Specifically, Dr. Thomas opined Mother would not progress unless she developed insight and acknowledged personal responsibility for her neglect of her animals.

**{¶32}** Notes from five family team meetings conducted by the Agency between April 23, 2024 and March 25, 2025 were admitted into evidence at the merits hearing.  At the first two meetings, Mother alleged one of the caseworks had a conflict of interest, as she was related to someone pressing criminal charges in the pending animal abuse case.  At the October and January meetings, Mother expressed her desire to replace the GAL, because the GAL did not like Mother.  At the March meeting, Mother accused Dr. Thomas of bias.

**{¶33}** According to Mother's schedule at Cedar Ridge Behavioral Health Solutions ("Cedar Ridge"), which was admitted into evidence at the merits hearing, Mother attended ten three-hour parenting classes, and roughly twenty-four Maternal Health classes, which she characterized as parenting classes.  The record contains certificates of completion for two parenting programs, Baby Basics (Maternal Health) on October 23, 2024 and Parenting Inside and Out on January 9, 2025.

**{¶34}** According to a summary of the Baby Basics curriculum, which was written by the course coordinator and admitted into evidence at the merits hearing, the course is comprised of ten classes.  Due to the number of Maternal Health classes on Mother's Cedar Ridge schedule, Mother appears to have repeated the course in 2025.

**{¶35}** Mother attended twice-weekly two-hour supervised visits with L.M. from September 9, 2024 to April 8, 2025, which were recorded by Cedar Ridge for the purposes of review and instruction.  Family team meeting notes reflect ongoing concerns regarding Mother's parenting skills, including that she was wiping "too hard", moving L.M. in and out of the highchair too frequently, failing to properly mix formula, and playing loud music.

Case No. 25 BE 0025

The January 2025 meeting notes recommend Mother repeat parenting classes due to continuing concerns about Mother's feeding methods.

**{¶36}** On January 8, 2025, Mother, represented by newly-appointed counsel, filed a motion to replace the GAL. The motion accused the GAL of bias, but provided no allegations in support of the bald allegation.

**{¶37}** Case plan 1.02 was filed on January 8, 2025 in response to Dr. Thomas' psychological evaluations. The second amended case plan integrated Dr. Thomas' opinion regarding Mother's cognitive deficits, which were compounded by underlying emotional difficulties that impact her judgment and reasoning. Among the concerns raised by the second amended case plan was Mother's failure to recognize Sister's cognitive deficits as disqualifying Sister from independently caring for L.M.

**{¶38}** On January 24, 2025, an annual review was set for February 19, 2025. On January 31, 2025, the Agency filed the motion for permanent custody, citing Dr. Thomas' psychological assessments as evidence in support of the motion.

**{¶39}** Mother attended monthly psychotherapy sessions at Cedar Ridge from May of 2024 to April of 2025. Notes from psychotherapy sessions are not in the record.

**{¶40}** Mother underwent a moderate complexity psychiatric evaluation with Julie Milliken, a psychiatric mental health nurse practitioner at Cedar Ridge on February 6, 2025. Mother reported considerable anxiety regarding the pending motion for permanent custody filed by the Agency. However, Mother refused prescription medication. Despite roughly one-year of psychotherapy at Cedar Ridge, Mother still denied any wrongdoing regarding her animal cruelty convictions during the February 19, 2025 psychiatric evalution. She alleged she was falsely charged and Maternal Grandmother was convicted on false evidence.

**{¶41}** A semi-annual administrative review was filed by the Agency on February 14, 2025. Under the caption "Concern Review," the Agency writes in relevant part:

> The ongoing concern of [Mother's] ability to parent is still present. [Mother's] IQ results show it would be difficult for [Mother] to safely or properly parent [L.M.] During visitations, [Mother] continues to struggle to properly feed [L.M.] despite the handwritten instruction given to her by the foster parent and observing a video created to show a visual of how to

complete this task. [Mother] refuses any type of help or recommendations given by an outside source/service given to her. [Mother] is resistant and believes she knows what is best for [L.M.] During times of [Mother] being resistant or defensive, she will attempt to recover by stating "I am just sarcastic" and "people don't get me." . . . There are also concerns about [Sister's] ability to understand and meet basic needs of [L.M.] [Mother] cannot comprehend that [Sister's] developmental disabilities would directly affect her ability to provide for [L.M.] [Sister] has stated if she saw [Mother] doing something wrong she would not call protective services.

(Semi-annual administrative review, p. 2-3.) The review noted L.M. was flourishing in foster care.

{¶42} At the annual review hearing conducted on February 19, 2025, the juvenile court accepted the testimony of Mother and the GAL, then overruled Mother's motion to replace the GAL. Next, the juvenile court addressed an oral motion made by Mother's trial counsel to continue the merits hearing, then scheduled for March 13, 2025, in order to allow Mother and Sister to undergo second psychological evaluations to be performed by Milliken at Cedar Ridge. Mother warranted she and Sister would undergo the evaluations as soon as possible.

{¶43} The Agency raised no objection to a brief continuance, subject to the statutory requirement that a merits hearing on the motion for permanent custody must be held within one-hundred-twenty days, otherwise the juvenile court would lose jurisdiction over the motion. To the contrary, R.C. 2151.414(A)(2) permits the juvenile court to continue the merits hearing for a reasonable time beyond the one-hundred-twenty day deadline for good cause shown.

{¶44} The trial court continued the merits hearing to April 10, 2025. No other motion to continue was filed prior to the merits hearing, nor oral motion made at the merits hearing.

{¶45} During her direct testimony at the merits hearing on April 10, 2025, Mother testified her evaluation could not be completed prior to the merits hearing as the earliest possible date for the evaluation was in July of 2025. According to the record, Mother and

Sister had a telephone interview with Psychological Health Services in Columbus on March 28, 2025 regarding their second psychological assessments.

**{¶46}** At the merits hearing conducted on April 10, 2025, the juvenile court accepted the testimony of Dr. Thomas; Kathleen Kendall, a Board-certified behavioral analyst, who facilitated family team meetings for the Agency; Lauren Battistone, a social service aide at the Agency; Shannon Weekley, an Agency case manager, and the GAL; who testified on behalf of the Agency. Mother, Sister, and Angela Weaver, the supervised visit coordinator at Cedar Ridge, testified on behalf of Mother.

**{¶47}** Dr. Thomas, who was qualified as an expert and had performed over 5,000 psychological evaluations during her career, opined both Mother and Sister suffered from cognitive deficits. Mother tested below-average in intellectual functioning. Sister tested in the lower extreme of intellectual functioning. Dr. Thomas found it "perplexing that [Sister is] identified as a source of support where ideally she'd be the one who would have added benefits from the community or other caregiver [for herself]." (4/10/25 Hrg. Tr. at p. 48.)

**{¶48}** Nonetheless, Mother and Sister were very confident in their opinions and their ability to raise L.M. Dr. Thomas opined, "when someone has this overconfidence, they're not likely to ask questions when they do need help." (Tr. at p. 45.)

**{¶49}** Further, Mother and Sister lacked insight and concern regarding their homelessness prior to L.M.'s birth. In addition to their inability to recognize the problem with living in a shed with no utilities, Mother accepted no responsibility for the dead animals found in the shed, and was far more interested in the identity of the person who reported the shed to law enforcement. Mother lacked problem-solving skills. She denied any anger management problem, but conceded other people considered her difficult.

**{¶50}** In addition to Mother's borderline intellectual functioning, anxiety, deficits in insight and problem-solving, Dr. Thomas cited Mother's chaotic childhood and adolescence as compounding her cognitive and behavioral health issues. Grandmother suffers from alcoholism and was convicted for animal cruelty during Mother's childhood. As a consequence, Grandmother, Mother, and Sister led a nomadic life, moving from hotel to hotel with periods of homelessness.

**{¶51}** Dr. Thomas opined, "[Mother] did not have the benefit of a good role model to teach her to become more independent, or understand appropriate manner [sic] in which to raise children or to live." (Tr. at p. 11.)  Dr. Thomas further opined that during Mother's 2024 evaluation, she did not have a full understanding of children or child development, citing Mother's plan to travel with L.M. to New York City in three years and expecting L.M. would later remember the trip.  (Tr. at p. 30.)

**{¶52}** Despite the chronic instability of Mother's life, including her own criminal convictions for animal cruelty, Mother refused to acknowledge she and Grandmother made any mistakes. Instead, she consistently blamed others for their circumstances. Mother revised history, for instance, she told Dr. Thomas that Grandmother provided stable housing during Mother's childhood, despite the fact that Grandmother, Mother, and Sister frequently moved and had periods of homelessness.

**{¶53}** Additionally, Mother did not acknowledge any wrongdoing or failure of care for the animals that died due to her neglect.  Despite referring to the dogs and cats as her "fur babies," Mother attributed their starvation and death to other people and represented she would not have done anything differently to protect them from harm.  As recently as February 6, 2025, during the psychiatric assessment, Mother conceded Grandmother had been convicted of animal cruelty, but claimed Grandmother was falsely charged and did not purposefully allow dogs to die.

**{¶54}** Dr. Thomas opined at the merits hearing:

> [W]ithout insight that there was problems [sic] with how they treated these animals or how they were living, there's concerns that [Mother] will not make any changes in the future.

> Additionally, there's also a correlation with how people may treat their animals and how they may also subsequently treat other human beings and without that insight that is problematic.

(Tr. at p. 27.)

**{¶55}** Dr. Thomas continued:

Case No. 25 BE 0025

And again, unless and until someone recognizes that they have done something wrong and recognizes that they don't know everything, they're not able to learn something new. But when you're in that stance of defending your lifestyle, the way you were raised, you really can't grow and raise a child in a different manner and that's where marginal completion, cursory going through, checking off the boxes is not acceptable.

(Tr. at p. 28-29.)

{¶56} Dr. Thomas observed in Mother's 2024 evaluation that "marginal completion" of the case plan would be insufficient to establish Mother's ability to provide an adequate permanent home for L.M. due to the particular concerns presented by Mother's intellectual deficits. Dr. Thomas explained the foregoing statement at the merits hearing:

I just offered recommendations with the goal of reunification. That's the goal of these evaluations. And noting that because of the gravity of concerns in this case, marginal completion, you know, just checking the boxes, was not going to be satisfactory.

It is not just going through a parenting class. Anyone can sit through a parenting class; anyone can sit in counseling. This is about making changes, increasing insight and learning skills that you can apply with a child.

So this isn't just checking the boxes. This is about making the changes. . .

(Tr. at p. 59.)

{¶57} Kendall, the Board-certified behavioral analyst who facilitated family team meetings for the Agency, testified L.M. was thriving in her foster home and meeting all developmental milestones. Based on Kendall's observations during family team meetings, she further testified Mother was consistently resistant to suggestions regarding

L.M.'s care. Of equal concern, Sister was a caretaker to both Mother and L.M., and Sister was more of an advocate for custody of L.M., despite Sister's markedly lower IQ.

**{¶58}** Battistone, the social service aide at the Agency, testified Mother struggled to feed L.M. with a bottle. When Battistone attempted to help Mother, Mother was not receptive. L.M. would cry during feedings at supervised visitation, so Battistone would have to feed L.M. after the visit had ended. When L.M. progressed to eating rice cereal, Mother was not able to follow written directions on how to prepare it. Mother never absorbed Battistone's instructions.

**{¶59}** Battistone provided multiple instances of Mother's negligence. Mother brought a stroller to supervised visitation when L.M. was an infant, but the stroller was designed for a toddler. Despite being cautioned that use of the stroller could result in injury to L.M., Mother returned with the stroller at a subsequent visit. Mother did not properly fasten L.M. in her car seat. When L.M. began using a highchair, Mother did not fasten the restraint and L.M. slipped (the highchair was placed on the floor for training purposes). Mother fell asleep during another visit while holding L.M. and L.M. slid down into the corner of the couch.

**{¶60}** When Sister accompanied Mother to supervised visitation, the visits were "a lot more loud, chaotic, [and] rambunctious." (Tr. at p. 121.) Mother and Sister treated visitation like a "hang out session," with Mother and Sister joking with each other instead of interacting with L.M. Mother and Sister behaved in a juvenile manner, acting "giggly" and rowdy. (Tr. at p. 122.) When L.M. soiled her diaper, Mother handed L.M. to Sister. Battistone corroborated Kendall's testimony that Sister appeared to be in charge of L.M.'s care, and Sister assumed a parental role over Mother as well.

**{¶61}** At one supervised visitation, an Agency employee cautioned Battistone that Mother had threatened to go to the foster parents' house and "take her baby [and another foster child in their care] back." (Tr. at p. 127.) As a result, the foster parents necessarily became hypervigilant and Battistone began meeting them at the police department for supervised visitation exchanges.

**{¶62}** Weekley, the Agency case manager, testified Mother had not been able to properly feed L.M. and was unwilling or unable to accept the help and suggestions offered

to her. L.M. was often thirsty after supervised visitation because Mother did not give L.M. a bottle unless she was immediately receptive to it.

{¶63} Weekley confirmed Battistone's testimony that supervised visitation was loud and chaotic. When Mother and Sister were together, Weekley described supervised visitation as "three toddlers in the room" rather than two adults and a child. Weekley opined Mother and Sister looked as though they were "playing house" with L.M. rather than parenting her. (Tr. at p. 153.) Mother and Sister removed the table top from the highchair in the middle of feeding L.M., then Mother chased L.M. around the room on Mother's knees with a spoon in her hand. Mother and Sister brought children's toys to supervised visitation, then each played with one of the toys while L.M. played with another.

{¶64} According to Weekley, Sister took the lead role in parenting and Mother followed her directions. Sister had a bedroom full of dolls that she anthropomorphized. Sister explained one of the dolls had grown out of her clothes and she was taking another doll to the doctor for a broken leg, causing Weekley to question whether Sister could discern between a baby doll and a baby.

{¶65} Weekley described Mother's apartment as a "living, breathing doll house." (Tr. at p. 165.) The apartment contained minimal adult furniture, and was populated with several children's tables and chairs and play items. The only adult furniture was two small chairs, despite the fact that L.M. has never been to the apartment and Mother and Sister lived there.

{¶66} Although Weekley admitted Mother had fulfilled the plan requirements, Weekley expressed concern that Mother had failed to advance beyond supervised vistiation, and she was prohibited from keeping any animals for three years based on the terms of her probation. Weekley testified she had discussed the case with her supervisor and they both agreed Mother could not be left unsupervised with the child. Further, Weekley questioned the propriety of returning L.M. to Mother, if she cannot be trusted to safely care for animals.

{¶67} The GAL testified L.M. was flourishing with her foster family. The GAL's greatest concern with Mother was her negative reaction to any feedback concerning

parenting responsibilities, such as car seat safety and feedings. When feedback was offered, Mother became argumentative and would not implement the suggestion.

**{¶68}** The GAL, who was assigned at the inception of the case, testified Mother's behavior has not changed in the many months that followed. After almost a year of Agency feedback with the goal of implementing change, Mother was unable to correctly feed L.M. at a supervised visitation two days before the hearing.

**{¶69}** The GAL recounted the most recent family team meeting when concerns were raised regarding Mother's feeding method. Mother flatly rejected any feedback and responded she was feeding L.M. correctly. The GAL also cited her recent efforts to instruct Mother on the proper method of securing L.M. in her car seat, which were similarly met with an argument.

**{¶70}** The GAL observed two supervised visits that occurred the same week as the merits hearing. Supervised visits are recorded by the Agency. The GAL likened Mother's feeding method to a "jackhammer." Specifically, the GAL testified, "I was thinking to myself as a parent, there is no way this baby's getting breaths between bites cause [sic] it was just non – it was spoon, spoon, spoon, spoon. Not spoon, let her swallow, scape [sic] a little, another spoon. It was just one right after the other with no time in between." (Tr. at p. 226.)

**{¶71}** The GAL also expressed concern regarding Sister caring for L.M. while Mother is working. When Sister cared for L.M. during supervised visits, Sister behaved like a child of four or five playing with a baby doll. Further, Sister's congenital seizure disorder called into question her ability to independently care for L.M. for any extended period of time. Mother identified Aunt T as a possible babysitter, but Aunt T was previously unable to pass a home test.

**{¶72}** Although the GAL acknowledged Mother had complied with the requirements of the case plan, the GAL opined Mother had not demonstrated the behavioral changes necessary for reunification, as demonstrated by Mother's failure to progress beyond supervised visitation. Finally, the GAL echoed Dr. Thomas' concern regarding Mother's convictions for animal cruelty, noting that this type of behavior often times leads to abuse of the elderly or small children. As a consequence, the GAL

recommended it was in L.M.'s best interest to be placed in the permanent custody of the Agency.

{¶73}  Mother disputed virtually all of the Agency's testimony. She claimed she had never intended Sister to be a co-parent, and the term "co-mommies" was a joke between them.  Mother further asserted she had benefited from parenting classes and implemented Agency suggestions. Mother vehemently denied any plan to kidnap L.M.

{¶74}  Mother conceded she was "very grouchy, very moody" and "very much on edge" when she began treatment at Cedar Ridge.  She explained her anxiety had been controlled until the criminal charges were filed against her and Grandmother in 2023.  She credited Cedar Ridge with assisting her in controlling her anxiety through breathing and walking exercises.

{¶75}  Mother hoped to acquire a driver's license within two mother after the merits hearing. In the meantime, Mother planned to walk one hour each way to take L.M. to daycare when Mother had to work. When Mother worked during the evening, she planned to rely on Aunt T for childcare, but as previously stated, Aunt T was unable to pass a prior home inspection.

{¶76}  Mother acknowledged her apartment was "centered around [L.M.]," but Mother has recently added more adult furniture.  Finally, Mother testified that she and Sister were unable to undergo second psychological assessments because the earliest appointments available were in July of 2025.

{¶77}  Weaver, the supervised visit coordinator at Cedar Ridge, testified on behalf of Mother. Weaver opined Mother was capable of caring for L.M.  Weaver denied Mother displayed any difficulties feeding L.M. during the supervised visits.

{¶78}  Sister testified Mother was solely responsible for caring for L.M. and Sister attended supervised visitation for the sole purpose of playing with L.M. When Sister was asked if she is capable of caring for L.M. in Mother's absence, Sister responded in the affirmative, and explained she attended parenting classes, had certificates of completion, and "know[s] how to take care of a baby." (Tr. at p. 218.) Sister denied having any conversation about her dolls with Agency employees or suggesting L.M. might share their clothes.

**{¶79}** In the May 9, 2025 judgment entry sustaining the Agency's motion for permanent custody of L.M., the juvenile court opined, as to R.C. 2151.414(E)(2):

[T]he results of the psychological evaluations of [Mother] and the opinions of the expert who conducted the same, as well as observations by Agency staff and the [GAL] clearly and convincingly establish that [Mother's] cognitive and intellectual level is such that she is unable to provide an adequate permanent home for [L.M.] at the present time and, as anticipated, within one (1) year after the permanent custody hearing.

(5/9/25 J.E., p. 9.)

**{¶80}** With respect to R.C. 2151.414(A)(16), the juvenile court found:

[T]here is no dispute that, for the most part, as of the date of the hearing, [Mother] was doing what the Agency had asked her to do; however, substantial compliance is not in and of itself dispositive and does not preclude a grant of permanent custody to the Agency. This case is not about [Mother's] compliance or lack of compliance with the case plan and the clear and convincing testimony and evidence provided by the Agency establishes that [Mother] has failed and seems unable to apply what she has learned and she is incredibly resistant to accept constructive criticism and help in regards to her immature parenting abilities. . . . [Mother's] cognitive delays and inability to demonstrate appropriate change and somewhat bizarre behaviors, in conjunction with the similar attributes of [Sister], results in the Court concluding it would be very difficult for her to safely parent a child of such a vulnerable age.

(*Id.*)

**{¶81}** With regard to the best interest of the child factors, the juvenile court opined:

As to R.C. 2151.414(A)(1)(d), regarding [L.M.'s] need for a legally secure placement and whether that type of placement can be achieved

Case No. 25 BE 0025

without a grant of permanent custody to the Agency, [L.M.'s] physical and emotional well-being are being met in her foster home. [Mother] has not progressed to visits in her home and it cannot be determined if she can meet the needs of such a young child in an unsupervised setting. Further, [Mother's] history of animal cruelty and neglect and her resistance to acknowledge the same is concerning and calls into question whether she can take care of a young infant when she was unable to keep animals alive or notice when they were in distress or danger.

(*Id.,* p. 10.)

**{¶82}** Finally, with respect to Mother's testimony, the juvenile court opined:

During the [merits] hearing, [Mother] testified that she has had a change in behavior such that she recognizes the Agency's concerns and will put into practice what she has learned from the case plan services; however, during said testimony, the Court noted certain gestures and expressions which called into question the credibility of [Mother].

(*Id.*, p. 7.)

**{¶83}** This timely appeal followed.

## ANALYSIS

### ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED WHEN FINDING THAT THE MINOR CHILD COULD NOT BE PLACED WITH MOTHER WITHIN A REASONABLE TIME AND SHOULD NOT BE SO PLACED, AS SUCH A FINDING WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**{¶84}** "A parent's right to raise a child has long been established as an essential and basic civil right." *Matter of A.D.*, 2023-Ohio-276, ¶ 42 (7th Dist.), citing *In re Hayes*,

Case No. 25 BE 0025

79 Ohio St.3d 46, 48 (1997). For this reason, Ohio courts have viewed the permanent termination of parental rights as the family law equivalent of the death penalty in a criminal law case. *In re Hoffman*, 2002-Ohio-5368, ¶ 14. However, statutory laws exist to permit an agency to intervene for the purpose of protecting children. *Matter of J.C.*, 2021-Ohio-1476, ¶ 2 (7th Dist.), citing *In re C.F.*, 2007-Ohio-1104, ¶ 28.

**{¶85}** Appellant argues the manifest weight of the evidence does not support the juvenile court's decision regarding her ability to parent L.M. Appellee counters there is competent, credible evidence in the record that establishes Mother's borderline intellectual functioning, anxiety, deficits in insight and problem-solving, and inability to acknowledge mistakes or accept and integrate corrective feedback prevent her from providing an adequate permanent home for L.M., as anticipated, within one year after the merits hearing.

**{¶86}** The Ohio Supreme Court resolved a conflict among the districts regarding the appropriate standard of review in termination of parental rights – abuse of discretion or sufficiency/manifest weight of the evidence – in *In re Z.C.*, 2023-Ohio-4703. In concluding the sufficiency/manifest weight of the evidence standard applies, the Ohio Supreme Court explained the manifest weight standard as follows:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Id. at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." [*Eastley v. Volkman*, 2012-Ohio-2179,] at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that

interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

We recognize that the Eleventh District here described its abuse-of-discretion review similarly to how other courts have described sufficiency or manifest-weight review when it stated, "We will not substitute our judgment for that of the trial court applying a clear-and-convincing standard where there is ample competent and credible evidence supporting the trial court's determination." 2022-Ohio-3199, 195 N.E.3d 590, at ¶ 10, citing *In re A.J.O. & M.N.O.*, 1st Dist. Hamilton No. C-180680, 2019-Ohio-975, 2019 WL 1312858, ¶ 6. This reference to "competent and credible evidence" and its relationship to manifest-weight review has been described as follows:

The interplay between the presumption of correctness and the ability of an appellate court to reverse a trial court decision based on the manifest weight of the evidence was succinctly set forth in the holding of this court in *C.E. Morris Co. v. Foley Construction Co.*[, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978)]: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Seasons Coal Co.* at 80, 461 N.E.2d 1273.

*In re Z.C.*, ¶ 14-15.

{¶87} Pursuant to R.C. 2151.414(B)(1) and relevant to this appeal:

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

Clear and convincing evidence is evidence that produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

{¶88} Pursuant to R.C. 2151.414(E)(2):

In determining at a hearing held pursuant to division (A) of this section . . . whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

. . .

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(16) Any other factor the court considers relevant.

**{¶89}** The evidence in the record establishes Mother committed multiple, repetitive mistakes when caring for L.M., Mother was unwilling to acknowledge her mistakes, and she responded negatively to feedback, all of which resulted in her failure to improve her parenting skills. Despite attending three rounds of parenting classes and participating in monthly psychotherapy sessions, Mother was unable to advance beyond supervised agency visits with L.M.

**{¶90}** Agency witnesses consistently described supervised visitation as disordered and chaotic. Mother and Sister, with whom Mother resides, were distracted and giddy, and oftentimes more interested in interacting with one another than with L.M. Agency witnesses testified supervised visitation often appeared to be three children playing together, rather than two adults parenting a child. Agency witnesses further testified Mother and Sister treated L.M. like a doll.

**{¶91}** In her appellate brief, Mother argues Agency testimony establishing she treated L.M. like a doll does not demonstrate L.M. would be placed in any jeopardy in Mother's care. To the contrary, dolls may be cast aside when interest wanes or some other event draws attention. The same is not true for L.M.

**{¶92}** Further, Mother abdicated her responsibility for L.M. to Sister when Sister attended supervised visitation. Agency witnesses testified Sister appeared to be the caretaker of both Mother and L.M. However, Dr. Thomas opined Sister's intellectual deficits disqualify her from caring for L.M. for more than fifteen minutes. Dr. Thomas further observed Mother's identification of Sister as a person who could assist her in parenting L.M. reveal Mother's failure to recognize Sister's deficits, which are decidedly more extreme than Mother's. Finally, Dr. Thomas opined Mother and Sister displayed an overconfidence about their parenting skills, which rendered them less likely to request assistance when needed.

**{¶93}** Mother denied virtually all of the testimony offered by the Agency. Credibility determinations are vested in the juvenile court.

**{¶94}** The GAL's testimony was taken out of order, so she was the only Agency witness who testified after Mother. The GAL testified Mother was the "calmest and the most reasonable" that the GAL had ever seen her at the merits hearing.

**{¶95}** Further, Mother's own testimony at the merits hearing belied her representation that she is capable of admitting mistakes instead of blaming others. Mother acknowledged she was "bull-headed" and "super-aggressive" when she began treatment due to her anxiety. Mother characterized herself as a sarcastic person, but claimed she was less so following her treatment at Cedar Ridge. Then Mother asserted, "[s]ome people can't always tell a difference between sarc – you know, a joke or they think I'm being serious when I'm just trying to joke around with them." (Tr. at p. 185.) In other words, Mother took no responsibility for her consistently aggressive behavior from the inception of the case to the merits hearing, instead accusing the Agency witnesses of misinterpreting her sarcasm.

**{¶96}** Mother cited the incident when L.M. slipped from her highchair as evidence of her ability to accept constructive criticism of her parenting skills. Mother testified, Weaver said, " '[d]o it this way' and [Mother was] like okay, you know, not a problem. " (Tr. at p. 199-200.) Although Mother conceded L.M. was not properly fastened in the highchair, Mother explained, "[L.M.] slid out of the high chair to give me a hug." (Tr. at p. 200.) When asked if L.M. slid from the highchair on more than one occasion (presumably referring to the incident when Mother removed the table top from the highchair during a feeding), Mother repeated, "like I said, when [L.M.] slipped out of the highchair it was to give me a hug." (*Id.*)

**{¶97}** Finally, Mother testified her anxiety and ADHD were not severe and did not require medication, despite the fact that she suffered seizures during her teenage years that were precipitated by anxiety. During cross-examination, the Agency offered medical records that established Mother was offered prescription medication, but Mother refused as she did not think it was necessary. (Tr. at p. 205.) During Mother's February 6, 2025 assessment at Cedar Ridge, Mother told Milliken that Mother does not believe in mental health medication.

**{¶98}** With respect to Mother's testimony, the juvenile court opined:

> During the [merits] hearing, [Mother] testified that she has had a change in behavior such that she recognizes the Agency's concerns and will put into practice what she has learned from the case plan services;

however, during said testimony, the Court noted certain gestures and expressions which called into question the credibility of [Mother].

(5/9/25 J.E., p. 7.)

{¶99} Weaver was the sole case plan facilitator to testify Mother provided appropriate care for L.M. However, Weaver had only worked as the supervised visit coordinator at Cedar Ridge for eight months, and spent the previous seven years working as a teacher. With the exception of the foregoing information, there was no evidence of Weaver's educational history or credentials. Therefore, the juvenile court may have attributed no, or reduced, credibility to her testimony.

{¶100} Dr. Thomas observed that a strong support system would be necessary for Mother to successfully care for L.M. There is no dispute that Sister would be actively involved in L.M.'s care as Sister resides with Mother. However, Dr. Thomas had "no confidence that [Sister] will be able to assist [Mother] with raising [L.M.] or otherwise intervene and protect [L.M.] if [Mother] engages in problematic behaviors." (Tr. at p. 52.) With respect to Sister's ability to independently care for L.M., Dr. Thomas opined L.M. should not be in Sister's exclusive care for longer than fifteen minutes. (Tr. at p. 55.)

{¶101} The dissent predicates its decision to reverse the juvenile court's judgment entry on Dr. Thomas' observation that individuals with an I.Q. of 77 "require additional modeling, support, repetition, and some learning in order to demonstrate the ability to retain that information and apply it." (Tr. at p. 22.) However, the record reflects Mother attended and even repeated parenting classes. In addition, she was provided videotaped instruction regarding feeding. She rejected foster parents' advice regarding feeding because she is L.M.'s biological mother. She was offered consistent feedback from case plan facilitators, which she consistently rejected.

{¶102} Of equal import, when Dr. Thomas was asked at the merits hearing whether repeating parenting classes was worthwhile, she responded:

> If [Mother] has the same mindset, no, it won't be beneficial. Perhaps repetition will help her retain some additional information based on her intellectual functioning. But again, until she is open and not defending on

how she does everything and incessantly in that defensive state, when she can sit and actually listen to feedback and learn, she's not really going to benefit from participation in her parenting training.

(Tr. at p. 31.)

{¶103} The GAL testified Mother was abrasive and argumentative in the majority of their interactions, and Mother responded to feedback as if it was an insult to her parenting skills. The GAL testified that every team meeting devolved in an argument. When the GAL was asked if she believed Mother had made any advances in implementing behavioral changes from the inception of the case, the GAL responded, "I really, I don't." (Tr. at p. 225.)

{¶104} Moreover, Mother is prohibited from keeping animals for three years following her conviction. Both Dr. Thomas and the GAL cited the correlation between an individual's treatment of animals and their treatment of children, the elderly, and vulnerable people, as a major cause for concern. This concern is magnified by Mother's borderline intellectual functioning, anxiety, deficits in insight and problem-solving, and inability to acknowledge mistakes or accept and integrate corrective feedback, as established by the record.

{¶105} Mother's progress in housing and employment is laudable. However, there is no evidence that Mother will be able to overcome her borderline intellectual functioning, anxiety, deficits in insight and problem-solving, and inability to acknowledge mistakes or accept and integrate corrective feedback, which directly impact her ability to provide an adequate permanent home for L.M., within one year after the merits hearing. Further, the evidence does not show Mother has or will have a strong support system to provide an adequate permanent home for L.M., rather it shows the opposite with respect to Sister.

{¶106} In summary, there is competent, credible evidence in the record supporting the juvenile court's conclusion that Mother will be unable to provide an adequate permanent home for L.M. within one year after the merits hearing. Moreover, intermediate appellate courts are required to defer to the juvenile court's resolution of conflicting evidence and credibility assessments, as the juvenile judge has viewed the witnesses, observed their demeanor, gestures and voice inflections, and can use these

Case No. 25 BE 0025

observations in weighing the credibility of the proffered testimony. Based on our limited standard of review, the deference to the juvenile court's resolution of conflicting evidence and credibility assessments, and the existence of competent, credible evidence in the record supporting the juvenile court's decision, we find Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED WHEN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE MINOR CHILD, AS SUCH A FINDING WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶107} In her second assignment of error, Mother argues the juvenile court's best interest determination is against the manifest weight of the evidence. In considering the child's best interest, the juvenile court must consider all relevant factors, including, but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section

2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). R.C. 2151.414(E)(7) to (11) are inapplicable in this case.

{¶108} The juvenile court considered each of the foregoing factors and concluded L.M.'s best interest was served by sustaining the Agency's motion for permanent custody. With respect to L.M.'s interactions and interrelationships, the juvenile court recognized L.M. had been in the same foster home since birth, but for a few days, and based on the evidence in the record, was well-bonded with her foster parents after spending nearly one year in their home. The juvenile court recognized L.M. had not been in the temporary custody of one or more public or private children services agency for twelve of the previous twenty-two months, and she was too young to express her own wishes. With respect to L.M.'s need for a legally secure placement, the juvenile court cited the fact that Mother's time with L.M. had not progressed beyond supervised visitation, as well as all of the evidence relied upon in the first assignment of error. The juvenile court emphasized Mother's history of animal cruelty and abuse, which demonstrated her inability to care for the animals or recognize when they were in distress.

{¶109} Based on our review of the record, we find there is competent, credible evidence in the record supporting the juvenile court's best interest determination, such that the juvenile court did not clearly lose its way and create a manifest miscarriage of justice in sustaining the Agency's motion for permanent custody. Therefore, we find Appellant's second assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 3

**MOTHER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.**

Case No. 25 BE 0025

{¶110} In her third assignment of error, Mother asserts she received ineffective assistance of counsel due to her trial counsel's failure to seek a continuance of the merits hearing in order for Mother and Sister to undergo second psychological evaluations at Cedar Ridge. Appellee argues R.C. 2151.415(D) does not permit Mother to file a motion for extension of temporary custody in order to allow her additional time to complete the case plan.

{¶111} We summarized the burden of proof for ineffective assistance of counsel claims in parental rights cases in *In re J.H.*, 2025-Ohio-2380 (7th Dist.), as follows:

> The right to court-appointed counsel is provided to an indigent parent by statute and rule. R.C. 2151.352; Juv.R. 4(A). It has thus been concluded the standard [*Strickland v. Washington*, 466 U.S. 668 (1984)] test for ineffective assistance of counsel applies. *In the Matter of R.M.*, 2019-Ohio-5251, ¶ 44 (7th Dist.). That is, a claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland*, 466 U.S. at 687. If the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

> In evaluating an alleged deficiency in performance, the court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client" so that "counsel's representation fell below an objective standard of reasonableness." *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *Strickland* at 687-688. Our review is highly deferential to counsel's decisions as there are "countless ways to provide effective assistance in any given case" and there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Id.* at 142, citing *Strickland* at 689. We refrain from second-guessing the strategic decisions of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995).

On the prejudice prong, an appellant must show there is a reasonable probability the result of the proceedings would have been different but for the serious errors committed by counsel. *Id.* at 557-558. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial counsel. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley* at 142, fn. 1, quoting *Strickland* at 693.

*In re J.H.* at ¶ 89-91.

**{¶112}** At the annual review hearing conducted on February 19, 2025, the juvenile court addressed an oral motion made by Mother's trial counsel to continue the merits hearing, then scheduled for March 13, 2025, in order to allow Mother and Sister to undergo second psychological evaluations. Mother warranted she and Sister would undergo the evaluations as soon as possible.

**{¶113}** The Agency raised no objection to a brief continuance, subject to the statutory requirement that a merits hearing on the motion for permanent custody must be held within one-hundred-twenty days, otherwise the juvenile court would lose jurisdiction over the motion.

**{¶114}** However, R.C. 2151.414(A)(2) permits the juvenile count to continue the merits hearing for a reasonable time beyond the one-hundred-twenty day deadline for good cause shown. Subsection (A)(2) reads in relevant part, "[t]he court shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion." Consequently, the deadline for the juvenile court's judgment entry would have been August 19, 2025.

**{¶115}** The trial court continued the merits hearing to April 10, 2025. No other motion to continue the merits hearing was filed prior to the hearing, nor oral motion made at the merits hearing. During her direct testimony at the merits hearing on April 10, 2025,

Case No. 25 BE 0025

Mother testified that her evaluation could not be completed prior to the merits hearing as the earliest possible date for the evaluation was in July of 2025.

**{¶116}** Mother relies on speculation to establish she was prejudiced as a result of trial counsel's failure to file a second motion to continue. Dr. Thomas' psychological evaluations were performed over a series of weeks. There is no evidence in the record that the second psychological evaluations would be completed in time for the juvenile court to enter judgment by August 19, 2025.

**{¶117}** Further, the ineffective assistance claim is predicated upon speculation that the second psychological evaluations would contradict Dr. Thomas' findings. However, the majority of the evidence supports Dr. Thomas' conclusions, particularly that Mother and Sister would have difficulty processing and accessing information, they would be unlikely to admit mistakes, resistant to instruction, and overly confident in their parenting abilities. Dr. Thomas' opinions were substantiated by the evidence in the record, particularly that Appellant made no progress at all with respect to her ability to provide an adequate permanent home for L.M. within one year of the merits hearing.

**{¶118}** Accordingly, we do not find the results of the proceedings were unreliable or would have been different but for the failure of trial counsel to request a second continuance. We find instead that Appellant's third assignment of error has no merit.

## CONCLUSION

**{¶119}** For the foregoing reasons, the May 9, 2025 judgment entry of the juvenile court sustaining the Agency's motion for permanent custody is affirmed.

Robb, P.J., concurs.

Hanni, J., dissents with dissenting opinion.

Case No. 25 BE 0025

Hanni, J., dissenting.

{¶120} With regard and respect to my colleagues, I must dissent from the majority opinion. I would find merit with mother's first assignment of error and reverse the trial court's judgment.

{¶121} The testimony presented, while likely demonstrating that the child should not be reunified with mother at the date of the hearing, does not rise to the level of clear and convincing evidence that the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents as is required by R.C. 2151.414(E).

{¶122} Most of the witnesses testified that mother had "completed" or "checked the boxes" of the case plan. However, they were not convinced that she had learned enough to adequately care for the child.

{¶123} Dr. Thomas testified that mother functions in the below average range of intellectual ability. (Tr. 22). People in this intellectual range, said the doctor, require additional modeling, support, and repetition in order to demonstrate the ability to retain and apply information. (Tr. 22). The doctor did not testify that people in this range are not capable of safely caring for a child. Mother demonstrated that in one year's time she was able to significantly change her life for the better. Thus, given mother's intellectual ability it may be possible that she can continue to make the changes necessary to care for the child within a reasonable time.

{¶124} The child was placed in the agency's custody in March 2024. At that time, mother was filthy, living in a shed, unemployed, and facing misdemeanor charges. The hearing in this matter was held in April 2025. At that time, mother was clean, had secured an apartment, was gainfully employed, and had taken responsibility for her criminal acts by pleading guilty to the charges she had been facing and paying off her fine. (Tr. 174-175, 194). Thus, in just over a year's time, mother had made significant positive changes in her life in an effort to be reunited with the child.

{¶125} In addition to these changes, mother now also attends regular counseling. (Tr. 174-175). She attended intensive parenting classes. (Tr. 174-175). Mother never voluntarily missed a visit with the child. (Tr. 208). And she is working toward obtaining her driver's license. (Tr. 199).

Case No. 25 BE 0025

**{¶126}** A parent's right to raise his or her children is an essential and basic civil right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45, 54." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. *In re Sims*, 2002-Ohio-3458, ¶ 23 (7th Dist.). In order to protect a child's welfare, the state may terminate parents' rights as a last resort. *Id*.

**{¶127}** This case has not yet reached the "last resort" stage.

**{¶128}** Based on all of the above, I would find clear and convincing evidence does not support the trial court's determination that the child cannot be placed with mother within a reasonable time or should not be placed with mother.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Belmont County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**